2-14-0337 Jack Barrow v. Village of Bensonville, Appalachian and Cross Appalachians and Bensonville Fire Protection District No. 2, Appalachia Argument for the Appalachians, Cross Appalachians, Attorney Stephen A. Jokic Argument for the Appalachians, Cross Appalachians, Attorney Sean P. Conway Argument for the Appalachians, Attorney Lizzie Winifred S. Albrock  And I think in this case it's absolutely clear and I think the lower court found that it was absolutely clear that there was an agreement to adjust the salary. What happened was that the village did not carry through on the agreement. Not only did they not adjust the salary, but also they didn't observe the legal formalities that they should have observed so that when the pension board looked at the case, the pension board could say yes, this was a regular transaction and we acknowledge it for the purposes of computing pension. Are you alleging that the village did this on purpose or it just fell through the cracks? Or is your theory that they did it on purpose or it fell through the cracks? So, Your Honor, that's a hard question to answer and I'll tell you why. Who knows what evil lurks in the minds of men. The shadow does. And I don't know what they were thinking, whether they would go back on the agreement or not. Well, wasn't there some attorney who said you really didn't think we were going to do that, did you? There was. I guess my answer to that, Your Honor, is that if you had to, if you could only enforce contracts where you 100% believed that the other side was going to follow through, we wouldn't have a lot of contract enforcement cases. There was some skepticism on Mr. Barber's side. Is this deal really going to happen? They satisfied him that it would when he signed the terms of the IGA. And not only did the village attorney tell him that, but he was told that by the outside lawyer for the village as well. And so I think it's real important to distinguish between what the agreement was and what the breach was. And the agreement was to take the action necessary so that the pension statute could be complied with. Was there ever any injunctive action associated with this case, either in this case or in a separate case, to a mandatory injunction that something should happen? So the way we pursued the case was we took administrative review of the pension board's decision. And the pension board looked at all the conflicting documentation submitted by the village and said, we can't make up our mind. And the lower court judge said that decision was not against the manifest way of the evidence. It was after that decision that we pursued the damages action, as opposed to, say, a mandamus cause of action or some other mandatory relief. And I don't think that our failure to pursue the remedy that we pursued, our failure to pursue some sort of mandatory action, forecloses any type of damage action against the village. The trial judge, in our view, got most of this right. He held that there was an agreement, and he held that the village violated the agreement that was made. But what the trial judge then went on to say is to say, well, it wasn't sure what was going to happen if the agreement was carried out, that there was a chance that he would not get his pension and that there was a chance that he would get his pension and that, therefore, it's outside the realm of damages permitted under Illinois law. And we think that that last conclusion of the trial judge was an error. And that relates to the public policy about pension spiking or something of that nature? Well, I think there's two pieces to it, Your Honor. One is, is that the lower court said that they were inclined to, that it was inclined to agree that this was an illegal spike, although it never ruled on that, never made a ruling one way or another. I think what the lower court said was more along the lines that even if the village had complied with every element of the agreement, raised his salary and defended him all along, I'm going to rule as a matter of law that a jury could not conclude from that compliance that he would have gotten his pension. And our argument is, is that if you submitted all the evidence to a jury, a jury had the authority to say, hey, if the village would have done what it was supposed to do and documented what it was supposed to do in a clear and unambiguous way for the pension board to follow, then there is at least a 50% chance that Mr. Barber would have gotten the pension. But didn't the trial court keep saying something about lost pension benefits? Yes. Well, I mean, the pension damages may be characterized in that fashion, but this is a contract action. He's entitled to damages, correct? Yes. And how they are characterized or packaged is not necessarily the decision that should have been made in summary judgment. Is that your position? That's our argument. I mean, it's equivalent in some ways to a lost profits case, because in a lost profits case, the defendant can always come in and say, well, the market went down. So and so would have left. Your advertising campaign might have failed. And so you're really not entitled to those lost profits. And the courts in Illinois have been fairly specific in saying that, well, just because you can't say for sure and just because you can't have an exact amount on the table, although the exact amount is easier for us here. It's the for sure part that's important. Just because you can't say for sure doesn't mean that you don't get to a jury on the issue. And our fundamental argument, therefore, is that the trial court erred when he held that we could not get to a jury on the issue. And had you gone and had the village pass an appropriation and given your client the raise, your argument is that he would not have been standing alone before the pension bill. Yes. Village would have been defending that decision and explaining why they did it and why he should receive his pension. So that greatly increases the likelihood of success in getting the pension. That's our argument. And we think that a jury should be should have been entitled to look at that argument and to make a decision. I'm not saying that it's a 100 percent argument. Obviously, the defendants would have some arguments as to why what happened happened. Maybe they didn't do it on purpose, et cetera. But but a jury should be able to weigh all of those things and make a decision. That's our argument. And, you know, the sort of the elephant in the room in this case, and we've talked about it already, is that, you know, there is there is this issue about something called a pension spike. Now, you know, you can't find the term pension spike in Black's Law Dictionary, but you can read the firefighter pension statute. And it talks about the salary attached to your rank on your last day of employment. Some pension statutes look at your last month. Others look at your last year. If you're a teacher, it's the highest four of your last ten.  And ironically, it was because of the wording of the statute that Mr. Barba was required to enter into these negotiations, because what he was told was you might be busted down to the rank of lieutenant. And your salary as a lieutenant would be $74,000 a year at year 30. And your pension would be calculated based upon that on your last day of employment. And obviously, that was a very unpalatable alternative, but it was driven by the way this particular statute is worded. Now, the Department of Insurance has promulgated a bunch of regulations on this. And we go back and forth in our briefs as to what exactly these words mean. But I think that the point of those regulations is to ensure that the public body at stake has taken some sort of regular action that is proper. As the municipal ordinance would be. Excuse me? As passing the ordinance to authorize it. Yes, yes. Or has taken some other sort of regular action to approve what is being done. And here we would say that that regular action was the adoption of the intergovernmental agreement by the village board that says we're going to do this. And as a result, we think this is much more like one of those situations where the public body does something and doesn't cross a T or dot an I. As opposed to a public body doing something that it didn't have the authority to do. And under those cases, the Staline case, the Kenny case, et cetera, the court can enforce an agreement. All right, counsel, you'll have time for response and other things that are negotiated. And so we will call you back at that time. All right. Thank you. Mr. Conway? May it please the court, Sean Conway on behalf of the village of Bensonville, appellee cross appellant. Your honors, the contract before the court designed in plaintiff's May 17th, 2007 letter is legally flawed and is void. And the plaintiff has lost no pension benefits on account of the village. Turning first to the validity of this contract, the Illinois law is clear. Contracts designed to achieve an unlawful purpose are void. And what's the unlawful purpose? To overburden the pension fund with a salary that is not authorized in the pension code and the pension regulations. And when has the village discovered this? Through this litigation, your honor. And if we look at the pension code and we look at the pension regulations right in concert, what they provide is salaries, annual salary, received regularly, is attached to the firefighter's rank as set forth in the municipality's appropriation ordinance. So these codes were never reviewed when this agreement was talked about, when it was memorialized in letters, and when it was put in the intergovernmental agreement. Your honor, I can only say this. I was not the attorney there at the time. It's good that you're standing here at this point then. I will say Mr. Barber was represented by counsel who was there at the time, who also had access to the regulations and the pension code. And I don't know whether that was reviewed by plaintiff's counsel at the time. But the village was the one who had to come up with some funds. If you read that, the village is the one who is responsible for that salary because he's going to leave before his 30th year. But in order to get to that 30th year and get the multiplier in to 75%, the calculation was this is what has to be accomplished. And the village agreed to that. Absolutely, your honor. And if you turn to the May 17, 2007 letter, it's undisputed and plaintiff has not disputed. It contains all the terms of the agreement. And if we look at that letter and particularly the salary raise provision, it at most provides for a one-time overage payment of approximately, the price of the agreement, approximately $322. And I say that because on May 17th, this is finally when plaintiff's counsel had informed the village of the precise salary that was required to achieve this 30-year pension. Now, the village was a little put off because, allegedly, Mr. Barber couldn't decide what amount of money he wanted. Absolutely, your honor. And that's part of the problem of this case. All of this time, the parties were going back and forth about, okay, and the village wanted to do this. I'm not backing away from it. But they were going back and forth about what is the salary. And so finally, on May 17th, 2007, you have this determination. Well, in looking at that May 17th letter, what happened was they made the pay increase retroactive to April 19th and would only cover one pay period. And also the retirement was retroactive. This is memorialized in a letter. Exactly, the May 17th, 2007 letter. But that's not the agreement we're construing, is it? It is, your honor, because that is in. The IGA is the same thing as this letter? This letter is what contains all the terms of the agreement. That's what plaintiff's counsel. I think that turned into an agreement letter, the IGA. Is that what you're saying? The IGA is basically an expression of the party's general intent to execute this plan. The May 17th, 2007 letter provides the exact terms of the plan. And it's these terms that violate the Illinois Pension Code. And what was the actual date of retirement? May 1st was the effective date of the retirement. Now, Mr. Barba didn't tender his retirement to the village until August 2007. He was receiving, I forget what it was, the vacation pay? Exactly, he got a vacation pay and sick pay payout. You cite Rhodes v. Calumet City Pension Fund, but in that case, the individual retired after the effective date of his retirement was after the date of the salary increase. Here, Mr. Barba, his retirement was after the effective date, correct? Correct, your honor. And what we cite in Rhodes and Swedenburg cases is for the general principle about the policy underlying the pension code that firefighters should get pensions to which they contribute. And if we look at this, again, we look at this May 17, 2007 letter, what was required of the village at most was to make one payment toward this increased salary, one payment. And if we look at the regulations, they require annual salary received regularly as attached in the municipality's appropriation ordinance. Where does it say he would receive one payment? In the salary raise provision of the May 17th letter, your honor. What it says here, the village agrees to increase his salary to $96,085.57 effective for 19-07, and he was to retire on May 1st of 07. All right, so he should get a prorated share in that particular paycheck, but why does that mean that's the only payment that he would be entitled to if he stayed longer? Because his retirement was May 1st, 2007. Why would he get a prorated share if it was not representing the salary he would be receiving if he would stay? Because he had already received, as of May 17th, he had already received his paycheck for that pay period on the old salary. So at most, what this provision requires is the village to pay him an additional $322 to make up the difference on one payment between the old salary and the new salary. And what the village is arguing here is that this plan, as designed by plaintiff's counsel, simply does not comport with the provisions in the pension code and the pension regulations. And in that way, it's really a plan to bring before the pension board a salary that is not authorized by the pension code. And in essence, what we have here is a joint effort by agreement to overburden a pension fund that is not authorized in the pension code and the pension regulations. Was this your primary argument before the trial court that, notwithstanding the party's clear intention, that the statute trumps the agreement and it's null and void? You made that argument? We absolutely did make that argument, Your Honor. And we also made the same argument can be used in connection with an analysis of pension benefit damages. If this plan cannot work as a matter of law, there are no lost pension benefits. Well, what you just said here today, that based upon that May 17th letter, he would only be entitled to $322. If that's the case, if it's void, why is he even entitled to $322? He's not, Your Honor. He's not entitled to any relief. Attorney's fees, $322. Now, if this court deems this plan set forth in this May 17th letter valid, then he would be entitled to $322. He would not be entitled to lost pension benefits because still... You keep saying lost pension benefits. He might be entitled to damages if there's a breach of contract that could amount to what he considers pension benefits, but that's not what it would be. It would be damages. Absolutely. The damages would be the calculation of lost pension benefits. But he would not be entitled to those damages, as the trial court correctly found. Lost pension benefit damages are not the natural and foreseeable result of the village's failure to issue Mr. Barba a $322 overage check. What about the village's failure to pass an appropriation ordinance that approved the salary increase retroactive? That's an excellent point, Your Honor. If we again look to the May 17, 2007 letter, the plan, the obligations, as drafted by plaintiff's counsel, notably missing from this plan is a village requirement to attach this new salary to his rank in a budget ordinance. Yes, there's also a presumption that when a village or a public body is going to act or is required by law to act, that they're going to follow the applicable law, which would have required the passage of an appropriation. And I understand that, Your Honor. That's the promise that the village made. They would take steps to ensure that his salary would be increased so he could enjoy the pension that he would have had he served out the entire 30 years at that position and rank. That's the argument that they're making. Absolutely, Your Honor. And the village's position is it did increase his salary. It did in June. It increased it by a change in status form. In fact, his vacation and sick payout was on the increased salary. But if this May 17 letter encapsulates all the obligations of the village, and plaintiff's attorney was not shy about including other obligations that the village had to perform, it should have included that additional obligation. Let me see if I can clarify your position. Are you now saying that if the village passed an ordinance authorizing this, then it would have been in compliance with the pension code and not an unlawful contract? Absolutely not, Your Honor, because of the pay raise provision. Only one payment on this increased salary is not authorized under the pension code and amounts to an unlawful effort to pension spike. Even if they passed the ordinance? Yes. Okay. So this plan would require at least, and unfortunately the statute and regulations aren't clear, but at least more than one payment. And this plan did not provide for it. Well, the village, we have two different parties. Who would manage the pension if this had happened the way the plaintiff contemplated? The pension board for the village. The district. The pension board for the village. And that's the other sort of issue here. We do have a transferring of, at the same exact time, a transferring of personnel and services. There was a pension board for the village who ultimately made this decision, and Mr. Barber appealed that decision. So it would have been the village's pension board to determine this issue. And Your Honor raises a very good point. This court need only look at the pension board filings in the administrative review proceeding to determine they also, and they argued, this was an illegal pension spike. And they did not say in their arguments, we didn't give Mr. Barber a pension because the village failed to give him $322. They said they had major issues with the timing of all this, all this retroactivity, which was not the fault of the village. That was the fault of the plaintiff because the plaintiff could not come to the village with an established salary. The village was saying, please let us know. We'll do that. Give us your calculation. And it's not until May 17th, two weeks after the effective date of his retirement, two weeks after the effective date of this salary increase, that the village and the plaintiff finally come to terms on the plan. To the best of your recollection, who first raised the words illegal pension spike? Was it the pension board or was it the village? Yes, it was the pension board. Okay. Do you have any other questions? No. No? All right. Counsel, you'll have time for some additional time. Yes. Coming up. Thank you, Your Honor. Yeah. And Ms. Cole-Ross? Yes. May it please the court. Counsel, Melinda Cole-Ross on behalf of the Bensonville Fire Protection District. I want to make sure that the court is clear as to the procedural posture of this case. The trial court found that the IGA did not confer third-party beneficiary status to Mr. Barba and dismissed the claims of third-party breach of contract based on third-party beneficiary. And that's the only issue right now as to the Fire Protection District. All the talk about these letters, May 17th, April 26th, that was all between the village and Mr. Barba's counsel. That did not involve the Fire Protection District. The only claim with regard to the Fire Protection District is based on the IGA. And why wouldn't it provide him that protection of being the third-party beneficiary? Well, I think first and foremost, the easy answer is because there's a provision that specifically states no third-party beneficiaries. It generally states. It generally states, but there's no indication that all of those general provisions do not apply across the 24-page agreement. Mr. Barba was not the only individual or entity specifically named in that agreement. So if you invalidate the no third-party beneficiary clauses to him, then under general contract construction principles, you'd invalidate it against all those other entities. And we discussed this in our brief. They talk about who's going to provide emergency services. They're going to buy land from another place for another fire station. All these different entities and individuals are named in that agreement. So if no third-party beneficiaries does not apply to Mr. Barba, it's out as to everybody. And I think that's a pretty drastic step for the court to take. And I think even if you say, okay, that's boilerplate, not conclusive, I don't think he's a third-party beneficiary without that clause. If you read the entire 24-page agreement, can you really say that the intent of these parties in entering the IGA was to confer this benefit on Mr. Barba? No. So it was the district's attorney who said you really didn't think we were going to give you that. Well, we're going to figure out whose attorney said that in the course of these proceedings. And I thought it was the city's, but now it sounds like it's more like the district's. I think that it might have been the district's. I cannot honestly say. That was raised in regard to the estoppel because the estoppel argument came in to say you cannot rely on this no third-party beneficiaries clause because of these representations you made. And in response to that, I think either the village and or the fire protection district said, hey, wait a minute. You realize that there might be a problem with this. You negotiated through all these letters, all these provisions with what the village was going to do for you. You did not rely. First of all, you tendered your intent to resign in February before you met with the fire protection district. So it's not as if your meeting with the fire protection district convinced you to retire. And then secondly, when you actually tendered your resignation in August, way after the IGA was entered, you stated what you were relying on. And you said, I am relying on tendering my retirement resignation on the May 17th letter from my attorney and the May 25th letter from the village. That establishes the procedures and what's going to happen. That's what I rely on. He did not say I relied on the fire protection district representations. He didn't say I relied on the IGA. And I think that opens and shuts the case as to the fire protection district. Did the district write any letters? No. This is all correspondence with the village. But the district was present, as was the new district police chief, when he was told that he was going to get bumped down to lieutenant status. He was told that, but I think that there's been a very negative spin here. There was a fire chief in place, Chief Spain, who was not Mr. Barba. Mr. Barba was the chief for this fire prevention bureau, a separate entity. And that entity was no longer going to exist when the transfer came to the fire protection district. But that doesn't make the fire protection district a bad actor. They just said that bureau is no longer going to exist. We already have a chief in place for the fire department, who is Chief Spain. You're not going to have a chief position. The position we can give you in the fire protection district is as a lieutenant. But then you're going to get the salary, which is a lower salary, attached to the lieutenant. So I don't think that there's any bad motive on the part of the fire protection district. Why was he asked to come to that meeting? Pardon me? Why was Mr. Barba asked to attend that meeting? Because I think that they wanted him to know this is what your status is going to be. Remember, Mr. Barba wanted to go on vacation for ten and a half months. He said, I want to resign. I want to end my active service March 29th of 2007. And I want to take ten and a half months of vacation to ride out into my 30 year. And the fire protection district said, you can't do that with us because you're not our employee. We don't owe you vacation. Here's what we can do for you. You're going to be a lieutenant at this salary. That left Mr. Barba fully aware that his option there with the fire protection district was not one that he wanted. And he started negotiating with the village, which was fine. I'm not going to speak to anything he did with the village. I'm just saying it doesn't apply to the fire protection district. We were not mad at him trying to cheat him out of something. There just wasn't going to be the same position because organizationally the new entity was different. Then why did the district enter into the IJA that provided to have this provision? Well, all it says that we didn't say we're going to do anything for Mr. Barba other than jointly defend him if he is challenged before the pension board. It says the village is going to make a salary adjustment. The village is going to do these things to protect his pension, not the fire protection district. We had no obligation to do anything. Again, he wasn't our employee. We didn't owe him a pension. All we said is if he gets challenged, we'll jointly defend him. And you know what? He did not ask us to do that. He brought his own attorney in and represented himself and then said we want you to pick up the payment. We want you to reimburse me the attorney's fees. And we said no, even if you are a third-party beneficiary, saying we're going to jointly defend you, we don't owe you the fees because you didn't come and ask us to defend you. You hired your own attorney and came in and now are handing us the bill and we're not going to pay it. So even though you're now saying you have absolutely no obligation to do anything for him because he was not your employee, you would have defended him pursuant to this agreement? If he had come in and asked, I think we would have done that and said. On what basis? If you don't think the agreement's valid, why would you do it? Professional courtesy? Well, I think we would have stood by what we said. We did stand by what we said. He never came and asked us to do that. Now, that doesn't mean it was going to make an illegal pension spike legal. I don't think our attorney in our district ever examined that issue because, again, we weren't going to pay out any money. We didn't hire him. He wasn't our employee. But I think if he had come to us and said, you said you would jointly defend me, that we would have done that because that's what we agreed to do, nothing further. And that's if he achieves third-party beneficiary status. And if the panel will allow me one minute, I did want to address what Justice Hudson asked about waiver. It wasn't just a few words changed in that second amended complaint. If you look at page 17 of our brief, he changed the substance of nine of his previously pled fact allegations and he added seven entirely new fact allegations. And we contend by doing that, he waived any challenge to the court's ruling on the amended complaint because he did not properly preserve them for review. Thank you, Your Honors. Mr. Jokic. Thank you. So my observation about the arguments of my very able and respected opposing counsel is that they're very loose with the facts in this case. And if you go to the- Can you talk in the course of your argument on that? I mean, he's thrown a major overarching grenade into the proceedings. He's saying, well, we feel bad, you know, you handled the negotiations, but I'm sorry that this is an unlawful, illegal agreement and it can't confer any benefits on anybody. So can you answer why that's not the case? Sure. The reason why that's not the case is that the pension code for firefighters says that your pension is determined by the salary attached to your rank on your last day of employment. And the parties agreed to attach a salary of $96,000 a year to Mr. Barba on his last day of employment. And what's the definition of salary? Well, there's a- Salary is what you regularly earn. Right. Okay. And at the point that he did not regularly earn his salary- I don't understand. Can you answer my question? Yeah, I'm sorry, Your Honor. Even if that had been accomplished through an appropriation, the pension board still could have said no, it's against public policy because that does not amount to a salary. So if I get promoted from firefighter to lieutenant in the last month of my service, I'm going to retire at the lieutenant's salary because that's the rank I'm at and that's the salary that's been put in the municipal ordinance. And as I indicated in my opening argument, the legislature knows how to write these statutes. It writes them different ways. And the legislature wrote this statute with respect to the last day of employment. Now, in addition to that, if you look at the regulations that they rely on, they have all sorts of different scenarios that they contemplate. And the regulation they rely on says it can be a one-time payment. And the regulation that they rely on says it can be something where it can be made retroactive. So there is no case that holds that what was done in this case is against public policy under this statute because the two police cases dealt with statutes that looked at your last month of earnings, not what you're selling us on your last day. And there is no case that says generally if parties take action to increase somebody's pension during the last part of their employment that that's illegal either. And so they have this overarching argument that it's a, quote, pension spike, which is a term not defined in any case. But respectfully, it's not borne out by the statutes and the regulations that we're dealing with here. And I think if you look at the course of conduct, the course of conduct all along was to do this in a way that would comply with the pension code. If you look at the very first letter in the course of dealings, that's the letter of April 26th. And that's the letter that incorporates the agreement to raise the salary to a level that will allow him to receive a pension equal to what he would have received had he worked through February 28th. On May 1, that language is in the intergovernmental agreement. On May 3, there's a letter from plaintiff's counsel to opposing counsel, something that's not mentioned at all, that has a number in it, 96,000 and some change. And on May 17, there's another letter that repeats that number. Now, it's true, the May 17 letter, that's all fine and good all by itself. And it's all fine and good all by itself because the village wrote back after that May 17 letter and said, you know what, everything you've set forth is correct. But you can't just cabin this to the one sentence in the May 17 letter that says that he'll get a certain salary effective on a certain date when the purpose of that was reflected in the April 26 letter in the intergovernmental agreement and in the course of dealings between the parties to make it effective in a way that would increase his pension. The trial judge recognized the letters too and saying that they supported the idea or they were indeed a contractual arrangement. Did the trial court do the interpretation of this salary is effective this day and you're resigning this day and that's why you're only entitled to $322? Is that where he got that from? Well, yes. I would say that that's a fair statement. The trial court said that the adjustment that took place on April, retroactive to April 19th was an adjustment for one pay period and that that was $322 and that's how he got that number. One other question. In addition, although counsel used this pension spiker illegality, he also argued that this was an overburdening of the pension fund. First of all, I'm still confused about whose pension fund and secondly, why is it an overburdening? It's the pension fund for the firefighters who worked for the village and now work for the fire protection district. So is that money transferred over? Yes. It's part of how the fire protection district would have been created. I think what the argument is, is geez, look at all the extra pension he would collect if his salary increase was deemed to be effective on April 19th and if the board would have been giving him his pension at the higher salary rate. So nobody had a calculator before May 1st or whatever date that this is effective? You know, I certainly had a calculator. We knew what we were doing. We knew what we thought the agreement was and we knew that we had a 29-year public servant who probably contributed more to this pension fund than any other person on the face of the earth because he had been there for 29 years and that everybody wanted to do right and that at some point down the road somebody decided well, we're going to run in and disown everything that we had been doing for four months and I think if you look at the allegations in this case that are verified you'll see that both the village and the fire protection district made representations and they could have said we can't do this, we've got to do something different or there are lots of ways creative lawyers can come up with things but they said we want to do this because we think this is the best way to do it and Mr. Barbara agreed to that. Now, are you standing on your brief concerning the fees? Yes, yes. And besides that I'm way over my time around here so you don't want to say go argue something else. But I stand on my briefs. I think we hit all the issues and I thank you for the opportunity to come and argue the case. Thank you. All right, Mr. Conway. Thank you. You said that you don't know if counsel had read the pension codes but they do have calculators in their offices, don't they? Absolutely, Your Honor. One thing I'd like to make clear is the pension regulation we're relying on is 4402.30 which provides salary is received regularly and is attached to the rank or class to which the firefighter or police officer is assigned. That regulation does not provide that one payment is enough. Well, what regularly is two payments enough? Is three payments enough? Is four? Does he have to stay through the whole year? Where does it say that? It doesn't, Your Honor. And I will stand here and concede. This regulation does not define how many payments are necessary to establish a regularly received salary. But one is not enough. But it's clear one is not enough. How? Well, because regularly received, if we look at what regular is defined as in the code, it says regular for the purpose of this part means a scheduled payment, and the schedule may be annually, quarterly, monthly, or any other basis. And the qualifier of any other basis, it would be perhaps biweekly, bimonthly. And in looking at the Black's Law Dictionary, plain definition of the term regularly is defined as fixed in certain intervals, regular in point of time, in accordance with some consistent or periodical rule or practice. And periodic is defined in Black's Law as reoccurring at fixed intervals to be made or done or to happen at successive periods separated by determined intervals of time. But you didn't have a job for Mr. Barba after May 1st. So what was he going to do in order? You didn't have a job at that salary. So what was he going to do for you at that salary? Because there was nothing he could do for the village anymore. Absolutely, Your Honor. But remember, this is all being done retroactively. So we've got a May 17th letter that indicates this salary raise plan should be retroactive. When you say all being done retroactively, what was the date of the IGA? May 1st. Right. And the letter was May 17th. The date of retirement was retroactive to May 1st. The pay raise was retroactive to April 19th. Now, there's nothing that prevented plaintiff's counsel from saying, I want this pay raise being retroactive six months prior. So at least as to establish some sort of regularity with this salary and then also require payment of the salary. But that's not what was done in this letter, and that's why the pension board said this is a pension spike. And if we look at the regulations in the statute, the village would submit this language that salaries should be regularly received and it should be attached to the firefighter's rank and the appropriation ordinance. That's an effort to build in some safeguards against spiking, artificially spiking somebody's salary. And if this is an artificial spike, I don't know what is. And that's what the pension board argued in the pension board proceedings, which is all part of the record on this appeal. And that's how plaintiff's counsel designed this plan. The village didn't design it. The village didn't write the May 17th letter. But wasn't, and you say you don't think it was in compliance with the codes and the issues, but as counsel has said, this statutory authority is written or regulatory authority is written, the salary for his rank, not for the last month, but the salary for his rank on the last day. And on the last day, he was the village fire marshal, basically, or something of that nature, correct? Correct. But also we have the statutes and the regulations that, as Justice Burkett pointed out, define what is salary. So it's twofold. Those statutes are read in harmony. What about counsel's point that there is no case that says this is against public policy? Your argument is that it's against public policy, but there's no case law that says it's against public policy. And Smith versus, I forget the case that we talked about earlier, there's nothing specific that says pension spiking is against public policy, if there's an appropriation. Right, Your Honor. And what I would submit to the court is the statute and the regulations determined is against public policy. The city of DeKalb case tells us agreements that violate the spirit of the pension code are void. And the court need only look at the statutes and the regulations, compare them to this May 17th letter, and I don't think this court can avoid a finding that this was an unauthorized pension spike, which has the effect of putting an overburden on the pension fund. So the harm of this agreement and agreements like this, it's not just confined to the parties. It harms the pension fund. It harms taxpayers who are contributing taxpayer dollars to fund the pension fund. It harms other firefighters who are hoping and expecting that that pension fund is solvent at the time they retire. Isn't a lot of this speculation what you're saying now? Well, basically what you're saying is if the pension fund paid this to Mr. Barba, it would break the fund. Is that what you're saying? I'm saying it would put a burden on the fund that's not authorized under the law. The pension itself puts a burden on the fund. If he retires, it's going to put a burden on the fund. Absolutely. And I don't think there's anything illegal about putting a burden on the fund. What is illegal is about putting a burden on the fund that is not authorized by the statutes and the regulations. Anything else, counsel? That's all I have. Thank you. Thank you. And according to my sheet, that's all we're talking in this one, other than for me to say thank you very much for your arguments today. We will take the matter under advisement, issue a decision in due course, and we will take a brief recess to prepare for our next case.